IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED
APR 2 2 2015
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* UNIVERSITY LOFT COMPANY <br><br> Plaintiff, <br><br> v. <br><br> AVTEQ, INC., KLN STEEL PRODUCTS, CO. LLC, THURSTON MANUFACTURING JOHN O'DONNELL and KELLY O'DONNELL <br><br> Defendants. | § § § § § § § § § § § § § § § § CIVIL ACTION NO. SA-14-CA-0528-OG <br><br> **FILED IN CAMERA AND UNDER SEAL** <br> Pursuant To 31 USC §3730(b) |

## PLAINTIFF'S FIRST AMENDED COMPLAINT
## (JURY TRIAL DEMANDED)

The United States of America *ex rel.* J Squared, Inc. d/b/a University Loft Company ("University Loft" or "Relator"), files this First Amended Complaint against Defendants Avteq, Inc. ("Avteq"), KLN Steel Products, Co., LLC ("KLN"), Thurston Manufacturing ("Thurston"), John O'Donnell and Kelly O'Donnell (collectively "Defendants"). UNIVERSITY LOFT also brings claims on its own behalf for damages caused to UNIVERSITY LOFT by Defendants and for injunctive relief. In support thereof, University Loft respectfully would show the Court as follows:

### I. PARTIES

1. University Loft is an Indiana Corporation having its principal place of business in Greenfield, Indiana.

2. Defendant Avteq, Inc. is a Texas corporation with its principal place of business at 1151 Empire Central, Dallas, Texas, 75247. Upon information and belief, the listed registered agent for Avteq, Inc. is Kelly O'Donnell.

3. Defendant KLN is a Texas corporation with its principal place of business at 4200 N. Pan Am Expressway, San Antonio, Texas, 78218. Upon information and belief, the listed registered agent for KLN is Kelly O'Donnell with listed address at 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

4. Defendant Thurston is believed to be a California corporation that has facilities in Grass Valley, California and San Antonio, Texas. Upon information and belief, the Chief Executive Officer for Thurston is Kelly O'Donnell.

5. Defendant John O'Donnell is an executive officer of Avteq and/or KLN and resides in Dallas, Texas. He may be served at the headquarters for Avteq at 1151 Empire Central, Dallas, Texas, 75247, or at any other location where he may be found.

6. Defendant Kelly O'Donnell is an executive officer of Avteq and/or KLN and resides in San Antonio, Texas. She may be served at the headquarters for KLN at 4200 N. Pan Am Expressway, San Antonio, Texas, 78218 or at any other location where she may be found.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. §§ 1331 (Federal question), 1345 (United States as plaintiff), and 31 U.S.C. § 3732(a) (False Claims Act). The Court also has jurisdiction over University Loft's Lanham Act claims and supplement jurisdiction over University Loft's state law claims for unfair competition.

8. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found, reside, and/or transact business in this District. Title 31, United States Code, Section 3732(a) further provides for nationwide service of process.

9. Upon information and belief, this Complaint is not based on the facts underlying any pending related *qui tam* action, within the meaning of the False Claims Act's first-to-file rule, 31 U.S.C. § 3730(b)(5).

10. This action is not precluded by any provisions of the False Claims Act's jurisdiction bar, 31 U.S.C. § 3730(e) *et seq.*

   a. Upon information and belief, this Complaint is not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party. 31 U.S.C. §3730(e)(3).

   b. Upon further information and belief, there has been no "public disclosure" of key facts alleged herein regarding University Loft's discovery and investigation of the fraud.

11. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because at least some of the Defendants can be found in and transact business within this District.

## THE FEDERAL FALSE CLAIMS ACT

12. The False Claims Act ("FCA"), which was originally enacted in 1863, was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153 to enhance the Government's ability to recover losses as a result of fraud. Among other things, the amendments created incentives for individuals with knowledge of fraud on the United States to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf. According to the

3

Supreme Court, the FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.

13. The FCA provides, among other things, that any person who 1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval or 2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable for a civil penalty ranging from $5,500 up to $11,000 (as of the filing date of this Complaint) for each such violation, plus three times the amount of the damages sustained by the Federal Government.

14. The FCA allows any person having information about false or fraudulent claims to bring an action as a relator for itself and the Government, and to share in any recovery.[1] The FCA requires that the original *qui tam* complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time). Based on these provisions, University Loft seeks through this action to recover on behalf of the United States all available damages, civil penalties, and other relief for the violations alleged herein. University Loft through this action also seeks to recover the damages it has sustained because of Defendants' actions.

15. Although the precise amount of the loss from Defendants' misconduct alleged in this action cannot presently be determined, University Loft estimates that the damages and civil penalties that may be assessed against the Defendants under the facts alleged in this Complaint are at least several million dollars.[2]

---

[1] The FCA was amended again 2010 in connection with enactment of health care reform laws. *See The Patient Protection and Affordable Care Act*, P.L. 111-148, Title X, Subtitle A, § 10104(j)(2), 124 Stat. 901 (Mar. 23, 2010). Among other changes, the "public disclosure bar" and "original source" provisions in Section 3730(e)(4) of the FCA were amended to broaden the ability of relators to bring *qui tam* lawsuits under the Act.

[2] Upon information and belief, the companies in the Avteq Group have been awarded over $400 Million in government contracts since 2006. While Relator believes the behavior of Defendants complained of

## III. DESCRIPTION OF THE PARTIES

16. *University Loft* - University Loft Company employs nearly two hundred American workers to manufacture and/or assemble its furniture at its factories in Indiana and Tennessee. University Loft and its American workers can compete head-to-head with any other company in the United States in this industry—as long as there is a level playing field and its competitors play by the rules.

17. *The Defendants* – Defendant Avteq, Inc. has divisions called Avteq Government Services and Avteq Living. In November 2011, Defendant KLN, which was a competitor of Defendant Avteq, declared bankruptcy along with its affiliated companies Dehler and Defendant Thurston (collectively, "KLN et al"). Avteq purchased KLN et al out of bankruptcy in 2012. Avteq, KLN, Dehler, and Thurston are treated as multiple brands under the Avteq Group umbrella (the "Avteq Group"). Avteq also appears to be affiliated with several companies that are not formally in the Avteq Group: Tupelo Manufacturing, which was based in Tupelo, Mississippi and recently shuttered its operations, and HJA, S.A. ("HJA"), which is a Colombian company based in Medellin, Colombia. HJA specializes in manufacturing steel furniture. Defendants John O'Donnell and Kelly O'Donnell own and/or control the companies in the Avteq Group.

## IV. SUMMARY

18. University Loft and companies in the Avteq Group are competitors and often bid for the same contracts in supplying furniture for military contracts. University Loft's supplier relationships, manufacturing techniques and its internal pricing models have been developed over many years and comprise the primary reasons why University Loft is often the successful

---

herein to be pervasive, Relator does not at this time have sufficient information to attempt to accurately calculate the damages and civil penalties for which Defendants would be liable.

5

bidder on projects. In recent years, however, University Loft has lost multiple contracts to companies in the Avteq Group. As described below, University Loft has learned that Defendants have been engaged in numerous illegal activities which have given them an unfair competitive advantage over University Loft.

19. University Loft learned that Defendants have defrauded the United States out of millions of dollars by engaging in a range of illegal activities involving procurement and delivery of goods under Government Contracts. These illegal activities include, but are not necessarily limited to: (1) bid-rigging, (2) artificially inflating costs on freight through the use of a sham company, (3) artificially inflating costs on auxiliary items, (4) falsely certifying that products were made in the United States when they were actually manufactured at an Avteq-affiliated factory in Medellin, Columbia, (5) falsely representing the origin of furniture as being manufactured by Defendant Thurston when the furniture was actually being manufactured at a cheaper price by an unauthorized subcontractor; (6) falsely representing to the United States that products were made prior to a cancellation order to induce the government to make a cancellation payment of over $250,000, and (7) falsely substituting inferior or nonconforming products on government contracts.

20. In addition to being flagrant violations of the False Claims Act, Defendants' actions also constitute unfair competition under Texas law. Moreover, Avteq represents on its websites and in other advertising that it is an "8A woman-owned, HUBZone certified firm," even though it has never been certified under the 8A Program and is not owned and controlled by one or more women. These false statements violate Section 43(a) of the Lanham Act, which prohibits "false or misleading representation[s] of fact" in advertising. 15 U.S.C. § 1125(a).

## V. FACTS

21. University Loft last learned that Defendants have been engaged in a variety of illegal schemes to defraud the United States. Brief descriptions of those activities are as follows.

### A. Falsification of Point of Origin

i. Manufacturing in Colombia – Defendants John O'Donnell and Kelly O'Donnell have an interest in a Colombian company called **HJA, S.A. ("HJA")** that is based in Medellin, Colombia. HJA specializes in manufacturing steel furniture and is associated with the Avteq Group. Avteq, which never manufactured any of its own products, used HJA (which never had a Government Contract) to manufacture furniture under Government Contracts in violation of the Buy American Act.[3] Upon information and belief, these violations occurred several times, including in connection with a (1) a government contract to provide furniture to Hunter Army Airfield in Savannah, Georgia in 2003 or 2004, (2) a government contract to provide furniture for a military base in Yuma, Arizona in 2007 or 2008 and (3) a government contract to provide furniture to a military base in California. In each of these instances, the furniture was shipped from Colombia but was represented as "Made in America."

ii. Furniture from Tupelo Manufacturing – Defendant Thurston has had various government contracts to provide "soft goods" (e.g. couches, lounge furniture) to government installations. Upon information and belief, rather than manufacturing this furniture itself or arranging for the furniture to be manufactured by an authorized subcontractor as represented, Thurston covertly used a company called Tupelo Manufacturing which was not an authorized

---

[3] Products from various designated countries can be used to fulfill government contracts without violating the BAA. Colombia was not a designated country until at least May 10, 2012, when the GSA published an interim rule that added Colombia to the definition of "Free Trade Agreement country." *See* 77 FR 27548.

7

subcontractor, to manufacture the soft goods at a lower price than the price stated in the contract. Under the directives of the individual defendants, Thurston then represented to the Government that the furniture was made by Thurston and charged the full price under the Contract.[4]

### B. Bid-Rigging

22. After Avteq purchased KLN and its affiliates out of bankruptcy in 2012, various companies in the Avteq Group would often submit multiple bids for the same government projects. Upon information and belief, project managers for the separate Avteq Group entities prepared the bids but then, in violation of the law, Defendant John O'Donnell individually reviewed all of the bids and made strategic changes to the bids to increase the chances that one of the Avteq Group bids would be selected. For example, Defendant John O'Donnell might structure one bid to be at a higher price with faster completion and another bid to be at a lower price but with a slower completion. By rigging the bids, the Avteq Group could appeal to the purchaser who was inclined to get a project done more quickly as well as to the purchaser who was more interested in the lower price. Submitting multiple bids also gave the Avteq Group an advantage in procuring contracts that only required the Government to obtain a limited number of bids.

### C. False Freight Invoices

23. Upon information and belief, Avteq and other companies in the Avteq Group have repeatedly and falsely claimed to use a non-existent freight broker named "Exceed Logistics," and submitted payment requests to the Government, relying on fabricated invoices created by Avteq. This fraud allowed Avteq to pocket the difference between the actual freight costs through UPS or other freight hauler and the amount invoiced by Exceed Logistics.

---

[4] These transaction with Tupelo Mfg. not only involved falsely designating the origin of the products, but also involved illegally inflating the prices charged to the Government.

24. Upon information and belief, Avteq used two different schemes in connection with the false freight charges. The first scheme was to add an automatic markup of 10% to the actual amount of the freight invoices. For example, if the actual freight charge was $17,000, Avteq had its bookkeeper in Dallas create a fake invoice from Exceed Logistics for $18,700 and would pocket $1,700. This scheme was apparently used on almost every transaction until the Government changed the way it handled payment of freight charges on contracts in or around 2013. The second scheme was used in conjunction with the first scheme. If the freight charge with the 10% "add-on" by Exceed Logistics was still less than the bid amount in the contract, Avteq created a fake invoice from Exceed Logistics that would be equal to the difference between the actual freight charge and the bid amount in the contract. For example, if the bid amount for freight was $30,000 but the actual freight charge was $10,000, Exceed Logistics issued one or more invoices that would equal $30,000, thereby allowing Avteq to secretly pocket an additional $20,000.

### D. Padding Auxiliary Items

25. A contractor, such as Avteq, is allowed to team with another government contractor to provide auxiliary items that the first contractor does not personally manufacture on the condition that the auxiliary items are provided at the cost invoiced by the subcontractor. Upon information and belief, Avteq routinely and illegally marked up the price on auxiliary items rather than charging the price invoiced by the third party manufacturer. For example, if the contract specified that Avteq would provide third-party refrigerators as auxiliary items at $320, Avteq might purchase the refrigerators for $300 each and pocket the difference.

26. This conduct continued after Avteq purchased KLN out of bankruptcy in 2012. While KLN before bankruptcy apparently had taken steps to ensure that the government was

charged the same price on auxiliary items that KLN paid to the subcontractor, no such controls were in place once Avteq and the individual defendants entered the picture.

27. Discrepancies between the price invoiced to the government and the price paid by Avteq, KLN or Thurston were not accidental. For example, upon information and belief, on one contract in or around 2012, there was a discrepancy of about $100,000 between the cost paid by Avteq for chairs from a third-party manufacturer and the cost charged to the Government by Avteq on the chairs. Avteq billed the full amount to the Government and kicked back $50,000 to the third-party manufacturer.

### E. Lying to Government to Obtain Cancellation Penalties

28. In 2009 or 2010, Avteq was awarded a large project for the base in Yakima, Washington to provide beds/mattresses. Upon information and belief, the award was successfully protested by KLN, which then received the contract. Defendant John O'Donnell then claimed to the government that Avteq had already made the furniture prior to cancellation and produced photos showing the furniture. Upon information and belief, Avteq had not made the furniture and John O'Donnell took photos of similar product for another order. He then falsely represented that the photos were of goods for the Yakima project. Based on these false representations, Avteq received payment from the Government of about $250,000 to $350,000 for products it never manufactured or delivered.

### F. Substituting Nonconforming or Inferior Products

29. Upon information and belief, the Defendants knowingly used materials and/or provide nonconforming products that are of lesser quality than required by contract with the government, which allowed the companies in the Avteq Group to cut costs and increase their margin. For example, the government contract might call for using Maharam fabric at a cost of

$40 per yard and Avteq or Thurston (through Tupelo Manufacturing or another vendor) would substitute fabric costing $6 per yard, but charge the Government the full price (*id.* at 41).

30. Similarly, KLN consistently used a lesser gauge steel in metal products than the gauge specified in the government contracts. KLN accomplished this activity by "gaming" the tolerance levels allowed under government guidelines for various gauges of steel. For example, because of variations in the thickness of steel from different suppliers, the specification for 12 gauge steel might allow 12 gauge steel to be up to 8% thicker (closer to 11 gauge) or 8% thinner (closer to 13 gauge). Because it was a large purchaser of steel, KLN was able to go directly to the mill and specify the thickness at the very bottom of the tolerance range.

*G. Misrepresenting Avteq as an "8A Woman-Owned, HUBZONE certified" firm.*

31. Avteq claims on its website and in other marketing materials to be an "8A woman-owned, HUBZone certified firm." However, upon information and belief, this advertising is literally false because Avteq was never certified or qualified under the 8A program.

32. Moreover, Defendant Avteq has obtained or attempted to obtain preferential treatment in soliciting and procuring government contracts by claiming that it is a Woman Owned Small Businesses. However, upon information and belief, Avteq is not a "woman-owned" small business (WOSB), which requires both ownership control and control of operations. *See, e.g.*, FAR 19.001 (a small business concern having at least 51 percent owned by one or more women; and management and daily business operations controlled by one or more women.). Upon information and belief, even though Defendant Kelly O'Donnell is nominally listed as the president of Avteq and may have ownership, she is not the control person for Avteq. Rather, John O'Donnell makes all important decisions.

## IV. CAUSES OF ACTION

### COUNT 1

### Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A)

33. The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

34. By virtue of the acts described above, Defendants violated the FCA by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval, including but not limited to the aforementioned fraudulently obtaining cancellation penalties, padding of amounts invoiced for auxiliary items and submitting false freight invoices.

35. By reason of Defendants' actions, the United States has been damaged, and continues to be damaged, in a substantial amount.

### COUNT II

### Violation of the False Claims Act - 31 U.S.C. § 3729(a)(1)(B)

36. The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

37. By virtue of the acts described above, Defendants violated the FCA by knowingly making, using, or causing to be made or used, false records or statements to induce the United States to pay a claim. Upon information and believe, this fraud includes misrepresenting the status of completion of product to fraudulently obtain cancellation penalties, submitting false documentation relating to amounts invoiced for auxiliary items and freight, misrepresenting Avteq as being a Woman-Owned Small Business, and submitting false documentation regarding the point of origin of products.

38. By reason of Defendants' actions, the United States has been damaged, and continues to be damaged, in a substantial amount. Moreover, to the extent that Defendant Avteq obtained any contracts by making false representations about being a Woman Owned Small Business, the Presumed Loss Rule applies and damages include, but are not limited to the full value amount paid by the Government to Defendants on such contracts. 15 U.S.C. § 632(w).

## COUNT III

### Conspiracy to Violate the False Claims Act - 31 U.S.C. § 3729(a)(1)(C)

39. The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

40. Defendants acted in concert with each other and with other conspirators to violate the False Claims Act as alleged in Counts I and II above. They committed the overt acts described above in furtherance of the conspiracy, including but not limited to rigging bids, inflating invoices, creating fictitious invoices, lying to the United States to obtain a cancellation payment, and making misrepresentations about Avteq being a Woman Owned Small Businesses.

41. By reason of Defendants' conspiracy, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT IV

### False Advertising by Avteq in Violation of the Lanham Act

42. The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

43. University Loft is a direct competitor of Defendant Avteq. Avteq has made and continues to make literally false and/or misleading representations of fact in its advertising and/or promotion in interstate commerce. By way of example, Avteq falsely claims on its

website and other marketing materials that it is an "8A woman-owned, HUBZone certified firm." These false and/or misleading representations of fact violate Section 43(a) of the Lanham Act (15 U.S.C. §1125(a)).

44. As a result of Defendants' unfair and deceptive business practices, University Loft has suffered and continues to suffer actual damages. These damages include, but are not limited to, the disgorgement of any profits that Avteq unfairly realized, retained or gained through its false advertising; the losses experienced by University Loft, the monetary expenditures that University Loft will be required to make on corrective advertising and education to inform consumers about the truth; and University Loft's costs incurred in prosecuting this matter.

45. Avteq and the individual defendants are making these false and/or misleading representations of fact with full knowledge that the representations are false and/or misleading, or in intentional disregard of their falsity and misleading nature. For this reason, University Loft is entitled to an award of enhanced damages under Section 35(a) of the Lanham Act (15 U.S.C. §1117(a)). Moreover, this is an exceptional case for which the Court should award University Loft its reasonable attorneys' fees.

46. Additionally, Defendants' violations of the Lanham Act have caused and will continue to cause irreparable harm to University Loft for which it has no adequate remedy at law. In particular, Defendants' past and continuing false and/or misleading representations of fact about being an "8A woman-owned, HUBZone certified firm" is causing irreparable harm to University Loft. University Loft will continue to suffer irreparable injury to its goodwill, rights and businesses unless Defendants and any others in active concert with them are enjoined from continuing their false advertising.

## COUNT V

### Unfair Competition by Avteq, KLN and Thurston

47. The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

48. University Loft is a direct competitor of Defendants Avteq, KLN and Thurston. By virtue of the acts described above, these Defendants have engaged in unfair competition under Texas law because they have engaged in a pattern of unlawful and/or unethical business conduct. These business practices are contrary to honest practice in commercial matters and have interfered with University Loft's ability to conduct its business.

49. Additionally, Defendants' acts of unfair competition described above have caused and will continue to cause irreparable harm to University Loft for which it has no adequate remedy at law. University Loft will continue to suffer irreparable injury to its goodwill, rights and businesses unless Defendants and any others in active concert with them are enjoined from continuing their acts of unfair competition.

50. University Loft hereby demands a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States *ex rel.* University Loft Company and University Loft on its own behalf, respectfully requests that judgment be entered against Defendants, ordering that:

   a. Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus three times the amount of damages the United States has sustained because of Defendants' actions;

b.  University Loft be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

c.  University Loft recover actual and exemplary damages on its Lanham Act and unfair competition claims;

d.  University Loft receive a permanent injunction against Defendants Avteq, KLN and Thurston that enjoins Avteq from its false advertising and enjoins Avteq, KLN and Thurston, and any others in active concert with them, from continuing their acts of unfair competition;

e.  University Loft be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and the Lanham Act; and

f.  the United States and University Loft recover such other relief as the Court deems just and proper.

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Ave., Suite 2200,
Austin, Texas 78701
(512) 480-5653 Telephone
(512) 480-5853 Telecopy

By: _____
Steven D. Smit
State Bar No. 18527500
ssmit@gdhm.com
Brian T. Cumings
State Bar No. 24082882
bcumings@gdhm.com

ATTORNEYS FOR UNIVERSITY LOFT COMPANY